**FILED**

APR 1 9 2016

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

STATE OF OKLAHOMA
OKLAHOMA WESTERN DISTRICT COURT

_____

KEVIN T. STOCKER

                Plaintiff,

      -vs-

AMERICAN ENERGY PARTNERS, LP

      -and-

ESTATE OF AUBREY K. McCLENDON

      -and-

KATHLEEN McCLENDON

      -and-

CHESAPEAKE ENERGY CORPORATION

      -and-

CHESAPEAKE ENERGY CORPORATION'S
BOARD OF DIRECTORS

      -and-

RICHARD K. DAVIDSON

      -and-

KATHLEEN EISBRENNER –

      -and-

V. BURNS HARGIS

      -and-

FRANK KEATING

      -and-

**COMPLAINT**  CIV-16-390-D

INDEX NO:

CHARLES T. MAXWELL

-and-

MERRILL A. MILLER, JR.

-and-

DON NICKLES

-and-

FREDRICK B. WHITTEMORE

-and-

LOUIS A. SIMPSON

-and-

MICHAEL A. JOHNSON

-and-

MARCUS ROWLAND

-and-

DOMENIC J. DELL'OSSO, JR.

-and-

SANDRIDGE ENERGY, INC.

-and-

THOMAS L. WARD

-and-

"JOHN DOE" and "MARY DOE"
(Said names being fictitious, it being the
intention of Plaintiff to add additional
co-defendants when identity ascertained)

_____ Defendants. _____

## SHAREHOLDER DERIVATIVE AND RICO COMPLAINT

1.   Plaintiff Kevin T. Stocker ("Plaintiff") alleges the following upon personal knowledge as to himself and his own acts as a shareholder, and upon information and belief as to all other matters.

2.   This is a shareholder derivative action brought by Plaintiff against defendants American Energy Partners, LP (hereinafter "AEP"), Estate of Aubrey K. McClendon (hereinafter "McClendon"), his wife Kathleen McClendon (hereinafter "Kathleen"), Chesapeake Energy Corporation (hereinafter "Chesapeake"), current and former member of Chesapeake's Board of Directors (hereinafter collective referred to as the "Board"), Richard K. Davidson (hereinafter "Davidson"), Kathleen Eisbrenner (hereinafter "Eisbrenner"), V. Burns Hargis (hereinafter "Hargis"), Frank Keating (hereinafter "Keating"), Charles T. Maxwell (hereinafter "Maxwell"), Merrill A. Miller, Jr. (hereinafter "Miller"), Don Nickles (hereinafter "Nickles"), Fredrick B. Whittemore (hereinafter "Whittemore"), Louis A. Simpson (hereinafter "Simpson"), Michael A. Johnson (hereinafter "Johnson"), Marcus Rowland (hereinafter "Rowland"), Domenic J. Dell'Osso, Jr. (hereinafter "Dell'Osso"), SandRidge Energy, Inc. (hereinafter "SandRidge"), Thomas L. Ward (hereinafter "Ward"), and "John" and "Mary Doe" (Said names being fictitious, it being the intention of Plaintiff to add additional co-defendants when their identity(ies) is/are ascertained) for intentional and reckless breaches of their fiduciary duties owed to Chesapeake's shareholders since 2008 through the present (hereinafter "time period").

3.   Additionally, this derivative and/or class action is brought pursuant to the civil provisions of Chapter 96 of Title 18, United States Code, codified at 18 U.S.C. §§1961 through 1968, entitled Racketeer Influenced and Corrupt Organizations ("RICO"), that authorize individuals to sue for civil remedies for their damages.

## INTRODUCTION

4.   In all relevant respects, Defendants acted in concert with each other in order to further their fraudulent scheme. Defendants colluded to take risks for personal gains and not in the best interest of Chesapeake and its shareholders. The risks have caused the company to be highly leveraged and involved in numerous lawsuits, all to the detriment of the shareholders. In order to avoid discovery of their fraudulent conduct and the possibility that they might be called to account for their conduct, Defendants engaged in a scheme to mislead investors and the public regarding the valuation of their company.

5.   Since McClendon co-founded Chesapeake in 1989 (along with Ward), he has completely dominated Chesapeake and the Board. He was involved as he influenced, and controlled Chesapeake's operations in every aspect, no matter how minute.

6.   Chesapeake's Board of Directors and Officers breached their fiduciary duties by allowing McClendon, co-founder, Chief Executive Officer, and formerly the Chairman of the Board of Chesapeake, to run the Chesapeake for his own benefit, and at the expense of Chesapeake's shareholders.

7.   Defendants' gross mismanagement failed to protect Chesapeake's corporate assets as they sold assets under their fair market value, paid grossly excessive management salaries, and have now leveraged substantially all of its assets.

8.   Defendants used Chesapeake's corporate resources for personal benefit. Defendants made false Securities and Exchange Commission ("SEC") filings in violation of criminal code as they highly leveraged Chesapeake with massive debt, and they hid secretive loans for McClendon and his wife Kathleen McClendon's personal financial benefits in the amount of $1.1 billion at shareholders' expenses.

9.   The allegations in this RICO complaint and shareholder derivative complaint (the "Complaint") are made upon Plaintiff's personal knowledge, and upon information and belief as to all other matters, based upon, among other things, the investigation by Plaintiff, including a review of publicly available information, SEC filings by Chesapeake, media reports about Chesapeake, and Chesapeake reports.

## JURISDICTION

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), and Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in this District, or is an individual who has **sufficient minimum contacts** with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice. Plaintiff is a resident of New York.

12. Venue is proper in this Court under 28 U.S.C. § 1391(a) and 18 U.S.C. §1965(a) as, to the former, Defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have

had an effect in this District, and, to the later, they reside and do business in this venue
both presently and during the class period at issue in the instant matter.

## THE PARTIES

**Plaintiff**

13. Plaintiff has standing as a shareholder in Chesapeake who owned and/or
purchased his shares during the relevant class period. He currently owns approximately
six thousand nine hundred forty-six (6,946) shares of Chesapeake stock. Plaintiffs shares
were purchased in the following: bought 277 shares at $53.36 on May 27, 2008; bought
418 shares at approximately $64 on June 11, 2008; bought 1,470 shares at $73.84 on July
2, 2008; sold 1,800 shares at approximately $26 on October 6, 2008; bought 1800 shares
at $23.71 on October 14, 2008; and bought 4,500 shares at $23.64 on April 2, 2012; and
had dividends reinvested to account for the additional stock owned. His cost basis in said
stock is over $250,000, while the current market value is approximately only $29,867.80
($4.30 a share on 3/8) due to Defendants' actions.

14. Moreover, Plaintiff purchased the Chesapeake shares in good faith with
the intent to fund his two young sons' future college education.

**Board**

15. The "**Board**" collectively includes, but is not limited to, the present
directors in addition to the following named co-Defendants in their roles as former and
present directors: Davidson who was a member of the Board since 2006 and signed
Chesapeake's 10-K SEC filings which were filed in March 2010, March 2011, and
February 2012; Eisbrenner who was a member of Board since 2010 and who signed

Chesapeake's 10-K SEC filings which were filed in March 2011 and February 2012; Hargis who was a member of the Board since 2008, his university received over $10 million in donations from Chesapeake, and who signed Chesapeake's 10-K SEC filings which were filed in March 2010, March 2011, and February 2012; Keating who was a member of the Board since 2003 and during the class period at issue, and who signed Chesapeake's 10-K SEC filings which were filed in March 2010, March 2011, and February 2012; Maxwell who was a member of the Board since 2002 and during the class period at issue, and who signed Chesapeake's 10-K SEC filings which were filed in March 2010, March 2011, and February 2012; Miller who was a member of the Board since 2007 and is the only member of the board to still be a member presently, he is also the lead director of a drilling company that received over $343 million from Chesapeake since 2009, and who signed Chesapeake's 10-K SEC filings  which were filed in March 2010, March 2011, and February 2012; Nickles who was a member of the Board since 2005 and during the class period at issue, and who signed Chesapeake's 10-K SEC filings which were filed in March 2010, March 011, and February 2012; Whittemore who was a member of the Board from 1993 to 2011, and during the class period at issue, and who signed Chesapeake's 10-K SEC filings which were filed in March 2010 and March 2011; Simpson who was a member of the Board since 2011 and during the class period at issue, and who signed Chesapeake's 10-K SEC filing for February 2012; and McClendon who was Chairman of the Board until he was forced out in 2012, and who signed all of Chesapeake's relevant 10-Q and 10K filings during the class period at issue.

**Officers**

16. McClendon, Dell'Osso, Rowland, and Johnson (hereinafter collectively referred to as "Officers") all served as corporate officers for Chesapeake.

17. McClendon was Chesapeake's CEO and Chairman of the Board from 1989 until 2012 when he was removed from the Chairman position. McClendon signed all of Chesapeake's relevant 10-Q and 10-K public filings during the period at issue.

18. Dell'Osso formerly was the CEO and CFO of Chesapeake and one of its subsidiaries. Dell'Osso also signed Chesapeake's 10-K filings which were filed on March 1, 2011 and February 29, 2012, and its SEC 10-Q filings which were filed on November 9, 2010, May 10, 2011, August 9, 2011, November 9, 2011, and May 11, 2012.

19. Rowland served as Chesapeake's CFO and Executive Vice President of Finance until October 29, 2010, and was also a member of the Chesapeake's Compensation Committee. Rowland signed the following Chesapeake SEC filings: 10-K SEC filings which was filed in March 2010 10-K, and the 10-Q SEC filings which were filed in May 11, 2009, August 10, 2009 , November 9, 2009, May 10, 2010, July 30, 2010, August 9, 2010, and November 2010.

20. Johnson served as Senior Vice President of Accounting, Controller, and Chief Accounting Office of Chesapeake since 2000. In said role, he signed Chesapeake's SEC 10-K filings which were filed on March 1, 2010, March 2011, and February 2012.

## STATEMENT OF FACTS

21. Chesapeake is headquartered in Oklahoma City, Oklahoma and is the second-largest producer of natural gas, a Top 15 producer of oil and natural gas liquids and the most active driller of new wells in the United Stated.  Chesapeake is a public

company traded on the NASDAQ Stock Market under the ticker symbol "CHK", with nearly 663 million shares outstanding as of December 31, 2015.

22. Chesapeake was co-founded in 1989 by McClendon, who was the highest-paid CEO of all S&P 500 companies in 2008 as he received a grossly excessive compensation package totaling $112 million, which indicates his dominance of the Company and its Board. The lucrative salary was paid to allegedly bail McClendon out of the debt he had accumulated by margining his Chesapeake stockholders to obtain personal loans over $600 million. Apparently, Chesapeake's stock decline forced McClendon to sell over 31 million Chesapeake shares to cover $569 million in margin calls from his brokers. The Board also then suspended the requirement that McClendon own Chesapeake shares worth five times his salary.

23. Throughout the class period at issue, McClendon leveraged his positions at the Chesapeake to obtain over a billion dollars of Chesapeake assets, and directed the company's business strategy and selected its business partners in order to increase the amount of Chesapeake assets transferred to him, at Chesapeake and its shareholders' expense. McClendon's complete domination over Chesapeake allowed him to fraudulently convert over a billion dollars of its assets to himself. The Officers and Board compounded this fraud by failing to stop and concealing McClendon's improper activities, and by falsely representing the potential risks to Chesapeake including the costs and expenses it would incur as a result of business transactions, and the overall debt.

24. Also in 2008, the Board provided McClendon with $600 thousand for private use of corporate jets, $600 for accounting, and $131 thousand for "engineering

9

support. At the same time, McClendon arranged for Chesapeake to pay $4.6 million to sponsor the Oklahoma City Thunder, which McClendon had a 1/5[th] interest.

25. McClendon owned roughly 1.35 million shares of Chesapeake stock in addition to his interest in the Founders Well Participation Program ("FWPP"). Under the FWPP employment arrangement, to which only McClendon could participate, he could purchase up to a 2.5% interest in wells being developed by Chesapeake. McClendon has elected to invest every year, selectively choosing such election for additional interest in the wells which were already determined would produce oil and gas To expand his interest in well assets under the FWPP, McClendon expanded Chesapeake's land acquisition and exploration program to include vast amounts of land that the company will never be able to utilize in its operations. The Board and Officers were fully aware of McClendon's scheme as they approved revisions to his employment agreement to include the FWPP.

26. Unbeknownst to shareholders, starting in 2009, McClendon leveraged all his FWPP interests for personal loans. McClendon not only secured loans on all of his ownership rights in the wells, but he also sold off revenue "participation rights" in the wells to the financial institutions who held his well interests as collateral.

27. The personal loan agreements required McClendon to "take all commercially reasonable actions" to ensure that Chesapeake and other owners and operators of the wells comply with the covenants and agreements of the loan. Consequently, these personal loan agreements involve Chesapeake and require McClendon to his exercise his rights to the wells on behalf of the lender rather than the corporation he runs. Thus, McClendon had an incentive to influence Chesapeake and its

board of directors to act in the interest of his personal lenders, rather than in the shareholders' interest, breaching his fiduciary duty and influencing the directors to do the same.

28. Chesapeake and its Board failed to disclose the extent of these McClendon's loans and their terms in Chesapeake's annual reports and proxy statements for several years. Chesapeake and its Board drafted, approved, reviewed, and/or signed said annual reports and proxy statements before filing them with the SEC and having them disseminated to shareholders. By allowing McClendon to take such risks with the FWPP and aggressive land acquisition, Chesapeake and its Board created a highly leveraged company which is jeopardizing the company's solvency and existence, while at the same time they were hiding this fact from the public and shareholders.

29. The size and nature of McClendon's loans raised concerns regarding McClendon's personal financial deals, and how the deals could compromise McClendon's fiduciary duty to Chesapeake's shareholders. Moreover, it is evident that the Board knew, or was deliberately reckless in not knowing, that the annual reports and proxy statements were materially false and misleading due to the material facts being concealed.

30. During the class period, Chesapeake disclosed in SEC filings the existence of the FWPP, but failed to disclose that McClendon had pledged his well assets to secure over a billion dollars in personal loans, and also falsely represented that the FWPP aligned the interests of McClendon and Chesapeake when they solely benefitted McClendon.

31. Chesapeake, its Board and Officers, disclosed the existence of the

FWPP in its March 2010 10-K, March 2011 10-K ,and , February 2012 10-K SEC

SEC filings by stating:

> "Mr. McClendon may elect to participate in all or none of the wells
> drilled by or on behalf of Chesapeake during a calendar year, but he
> is not allowed to participate only in selected wells. A participation
> election is required to be received by the Compensation Committee
> of Chesapeake's Board of Directors not less than 30 days prior to the
> start of each calendar year. His participation is permitted only under
> the terms outlined in the FWPP, which, among other things, *limits
> his individual participation to a maximum working interest of 2.5%*
> in a well and *prohibits participation in situations where
> Chesapeake's working interest would be reduced below 12.5% as a
> result of his participation.* In addition, the *Chesapeake is reimbursed
> for costs associated with leasehold acquired by Mr. McClendon*
> as a result of his well participation." (emphasis added).

32. The Boards and Officers also stated in a section in the February

2012 10-K titled "Disclosures About Effects of Transactions with Related

Parties," the following:

> "From time to time, Mr. McClendon has sold his FWPP interests in
> conjunction with sales by the Chesapeake of its interests in the same
> properties, and the proceeds related to those sales have been
> allocated between Mr. McClendon and the Chesapeake based on
> their respective ownership interests and on the same terms as those
> that applied to the Chesapeake's properties included in the sale."

33. The Board and Officer's statement in Chesapeake's filings that

McClendon's sales of FWPP interests were "in conjunction with the sales by the

Chesapeake of its interests in the same properties" was false and misleading

because they knew, or were extremely reckless in not knowing, that McClendon

had pledged his well assets to third parties as collateral for over a billion dollars in

loans, and those third parties stood to take possession of those interests should

McClendon default. Contrary to Chesapeake's public filings, McClendon's

pledging of his well interests was not in conjunction with any sales by the

Chesapeake.

34. During the class period, the Board and Officers also fraudulently

stated in Chesapeake's filing that the FWPP served to align McClendon's interests

with the interests of the Chesapeake. The Chesapeake stated in its Form 14A

Proxy Statement filed April 30, 2009 and the Form 14A Proxy Statement filed

April 30, 2010 the following:

> "The FWPP fosters and promotes the development and execution of
> the Chesapeake's business by (a) retaining and motivating our CEO
> who co-founded the Chesapeake; (b) aligning the financial rewards
> and risks of Mr. McClendon with the Chesapeake more effectively
> and directly than other performance incentive programs maintained
> by more of the Chesapeake's peers; and (c) imposing on Mr.
> McClendon the same risks incurred by the Chesapeake in its
> exploration and production operations.   The Compensation
> Committee reviews Mr. McClendon's participation in the FWPP on
> a semi-annual basis and periodically adjusts the acreage costs
> charged to Mr. McClendon to ensure his reimbursements reflect the
> Chesapeake's recent acreage activities."

35. The Board and Officers disclosures in Chesapeake's filings that the

FWPP "fosters and promotes the development and execution of the Chesapeake's

business" by "aligning the financial rewards and risks of Mr. McClendon with the

Chesapeake" were materially false. The Board and Officers knew, or were

extremely reckless in not knowing, that the FWPP advanced the personal interests

of McClendon rather than the best interests of the Chesapeake and its

shareholders. Additionally, the Board and Officers knew, or were extremely reckless in not knowing, that the FWPP allowed McClendon to participate in lucrative Chesapeake wells without incurring exploration costs, thereby guaranteeing himself better overall opportunities and better returns than Chesapeake's shareholders. Therefore, it is obvious that the Board and Officers knew that the FWPP did not align the "financial rewards and risks of Mr. McClendon with the Chesapeake."

36. Similarly, the Board and Officer's statement in Chesapeake's filing that the FWPP "impos[es] on Mr. McClendon the same risks incurred by the Chesapeake in its exploration and production operations" is false, because they knew, or were extremely reckless in not knowing, that only Chesapeake assumed the costs associated with the exploration, development and testing of wells.

37. Following the news disclosing McClendon's loans to the public on April 18, 2012, several years after the loans were made and never disclosed during said period, the price of Chesapeake stock fell sharply. Thereafter, the stocks have continued to fall due to Defendants' corporate mismanagement and breach of their fiduciary duties owed to the shareholders as it was disclosed that Chesapeake had an additional $1.4 billion in previously undisclosed liabilities. Due to its extreme debt, Chesapeake was forced to sell off some its most valuable assets. Chesapeake's stock price has declined to as low as $1.50 in February of 2016 in contrast to its high of $74.00 in June 2008 – a decrease of 98%. Thus, as a result of all the Officers and Board's breaches of fiduciary duties to

Chesapeake and its shareholders as they have subjected Chesapeake to substantial losses, adverse publicity, and other occurrences harmful to Chesapeake and its shareholders.

38. McClendon was forced to resign from his leadership position at Chesapeake, and was given a multimillion dollar severance package valued at $13 million (Another breach of corporate fiduciary duty) despite the aforementioned acts. In addition thereto, McClendon was receiving $975,000 a year in severance along with $1.95 million for the first four years as a yearly bonus.

39. Moreover, the incomes and assets that McClendon received from Chesapeake including his grossly excessive salary, loans, bonuses, benefits, stock rewards and options, severance, and corporate property provided him a life of luxury. Additionally, his wife, co-defendant Kathleen McClendon, also benefited greatly, albeit indirectly, from the misconduct of her husband. The two own, in whole or part, the Oklahoma City Thunder NBA team, a winery, dozens of restaurants, and a multimillion dollar antique map collection.  At the same time, Chesapeake's shareholders watched the value of their investments and/or pensions diminish without any recourse.

40. McClendon's selfish, personal gain motivation at the expense of shareholders continued after leaving Chesapeake. Prior to resigning as CEO and a director, McClendon took possession of Chesapeake's corporate trade secrets consisting of highly sensitive maps and prospect data by making an assistant copy documents consisting of Chesapeake trade secrets. In no manner was said action in the best interest of shareholders while still having a duty to do such.

41. After McClendon resigned from Chesapeake, he took with him the aforementioned trade secrets of Chesapeake for his next venture.

42. McClendon then opened a new company, AEP, the day after resigning, which he operated in direct competition with Chesapeake in violation of noncompetition clauses and to the detriment of Chesapeake's shareholders.

43. Upon information and belief, McClendon attempted to assure AEP's success before its creation as he took more than severance from Chesapeake, as he also took trade secrets consisting of maps and documents detailing gas and oil deposits with which to create AEP while he was still a member of the Officers and Board. Since he was still a member of the Officers and Board, he still had duties to the shareholders of Chesapeake when he had an assistant make copies of the trade secrets and formulated the plan to create AEP and guarantee its success using said trade secret documents.

44. Additionally, on March 1, 2016, McClendon was indicted in an Oklahoma Western District Court for conspiracy to rig bids. Upon information and belief, Ward and SandRidge Energy, Inc. colluded with McClendon and Chesapeake in the scheme. Upon information and belief, as the details of said scheme become public knowledge, it is anticipated that Chesapeake will face extensive litigation from landowners who were conspired against in the sell of their leasing rights, further damaging shareholders.

45. The day following the news of the indictment, McClendon was killed in a single car accident on March 2, 2016 when his SUV hit a concrete embankment while traveling at a high rate of speed.

46. Presently, Chesapeake remains highly leveraged as it struggles to pay off its debts and has seen a large increase in litigation against the company due to Defendants' actions in mismanagement of the company and fraudulent practices. In April, 2016, the company pledged "substantially all" of its interests in gas fields, office

buildings, derivatives contracts, and mortgages encumbering 90% of all the company's assets as collateral to maintain access to its $4 billion credit line.

47. An example of said fraudulent practices, in 2015, Chesapeake settled a case with the State of Michigan for $25 million for antitrust, fraud, and racketeering charges against it. In that case, Chesapeake plead no contest to the charge that it colluded with a foreign company to price fix leases in Michigan.

48. Moreover, Chesapeake has already been settling a myriad of lawsuits stemming from miscalculation of royalty payments. In the last year, approximately 400 lawsuits were filed against Chesapeake prior to being consolidated into a massive single case with upward of $1 billion in unpaid royalties at stake.

49. These lawsuits all stem from Defendants' actions and mismanagement, and have caused shareholders to suffer damages as the company is losing value and assets from it being vulnerable to excessive verdicts, incurring attorney costs, and paying settlement amounts for their mismanagement.

50. Additional lawsuits seem inevitable after the aforementioned indictment of McClendon for bid rigging with allegedly Ward and Sandridge as well as other companies, despite said indictment charges being allegedly dropped due to the untimely death of McClendon. These lawsuits stem from Chesapeake operations for which the Officers and Board were responsible and had a duty to the shareholders, and undoubtedly will force Chesapeake to expend considerable resources to pay for attorney fees and awards.

## DUTIES OF THE DEFENDANT AS OFFICERS/DIRECTORS

51. McClendon, as a director and the CEO of Chesapeake, the Officers, and the Board both had duties to the company and shareholders which they breached.

52. By reason of each individual's position as part of the Officers and/or Board, and because of their ability to control its business and corporate affairs, the individual members of the Officers and Board owed the shareholders the fiduciary obligations of good faith, trust, loyalty, and due care. In these obligations, the Officers and Board were required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. Moreover, the Officers and Board were required to act in furtherance of the best interests of Chesapeake shareholders equally and not in furtherance of their personal financial interests or benefit.

53. Each member of Chesapeake's Officers and Board owed to the shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Chesapeake and in the use and preservation of its property and assets, and the highest obligations of fair trading.

54. Said duty is required under the criminal and civil statutes of the SEC.

55. Moreover, as Officers and Board of a publicly held company, the individuals had a duty to promptly disseminate accurate and truthful information concerning Chesapeake's revenue, margins, expenses, salaries, loans, operations, performance, and management, so that the market price of Chesapeake's stock would be based on truthful and accurate information.

56. To discharge their duties, the Officers and Board were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of Chesapeake,

57. From these duties, the Officers and Board were required to manage, conduct, supervise, and direct the business affairs of Chesapeake in accordance with the laws of the United States and the states in which it conducted business in addition to Chesapeake's charter and bylaws.

58. The Officers and Board were also required to implements and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent other members of the Officers and Board, in addition to employees of Chesapeake, from violating or acting in contravention of all applicable Federal and state laws, rules, and regulations.

59. Moreover, the Officers and Board were required to neither violate, nor knowingly permit any officer, director, or employee to violate applicable laws, rules, and regulations.

60. The Officers and Board were prohibited from engaging in self-dealing or knowingly permitting any officer, director, or employee to engage in self-dealing.

61. The Officers and Board were required to conduct Chesapeake's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting corporate assets, and to maximize the value of Chesapeake's stock.

62. The Officers and Board were required to remain informed regarding Chesapeake's operations and make reasonable inquiries upon receipt of notice of

imprudent or unsound condition or practices, and thereafter take steps to correct such conditions or practices.

63. The Officers and Board were required to refrain from using their status as directors or officers to the detriment of Chesapeake shareholders.

64. The Officers and Board owed the shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of Chesapeake, as well as in the use and preservation of its property and assets. The conduct of the Officers and Board alleged herein involves violations of their obligations as directors or officers, the absence of good faith on their part, and a reckless disregard for their duties to Chesapeake's shareholders which the Officers and Board were aware, or should have been aware, posed a risk of serious injury.

65. Additionally, Chesapeake's established Code of Business Conduct and Ethics applies to all its employees including the Officers and Board. The conduct of the Officers and Board herein allegedly constitutes a violation of the aforementioned conduct and ethics code.

## CAUSES OF ACTION

### A.      Count One: Violation of Title 18, United Stated Code, Section 1962

66. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

67. From at least 2008, and continuing up to and including the date of the filing of this complaint, Defendants did unlawfully, knowingly, and intentionally conduct

and participate, directly and indirectly, in the conduct, management, and operation of the affairs complained of herein, which constituted a pattern of racketeering activity consisting of numerous acts for which civil remedies could be awarded under 18 U.S.C. §1964(c) for prohibited activities set forth in 18 U.S.C. §1962(a)-(d).

68. Defendants' conduct constituted prohibited, racketeering activity through 18 U.S.C. § 1962 through the following actions as listed in the definition of "racketeering activity" in 18 U.S.C. § 1961(1): mail fraud pursuant to 18 U.S.C. § 1341; wire fraud pursuant to 18 U.S.C. § 1343; and fraud in the sale of securities pursuant to 18 U.S.C. §1961(1)(D).

69. As to mail and wire fraud, Defendants created a scheme to defraud by:(1) perpetrating a false representation of material fact or material omission as to the financial condition of Chesapeake by intentionally failing to disclose the amount and terms of McClendon's personal loans, as well as member of the Officers and Board use of business property for personal use, to the SEC in the company's required annual reports; (2) the Officers and Board knew or believed to be false said reports based upon their approval of the actions which were a blatant mismanagement of Chesapeake, many of which were subsequently concealed from shareholders; (3) the Officers and Board made said material misrepresentations and/or omissions on the financial reports with the intent to induce the Plaintiff and other shareholders to rely by maintaining ownership of Chesapeake stock or purchasing said company's stock while intentionally inflating its value by deceiving the public; (4) Plaintiff and other shareholders justifiably relied on these misrepresentations and/or omissions with the faulty belief that Chesapeake was performing well based upon the filings; and (5) Plaintiff and shareholders were injured as

a result of such reliance as the stocks' value was artificially inflated by the misrepresentations and/or omissions, and since the misrepresentations and/or omissions became public the stock price has plummeted. Additionally, the Officers and Board knowingly participated in the scheme to conceal and not disclose the actual material facts as they were interested and relied upon the artificial inflation of the stock price. Moreover, the Officers and Board used the mail and/or wires in furtherance of that scheme by using said mediums to communicate the financial condition of the company to Plaintiff, other shareholders, and the public at large.

70. The mail and wire fraud requirements for RICO were satisfied as Chesapeake failed to disclose the extent of McClendon's loans and their terms in Chesapeake's annual reports and proxy statements for several years (2009 – 2013) to the SEC and shareholders. The Officers and Board drafted, approved, reviewed, and/or signed said annual reports and proxy statements before filing them with the SEC and having them disseminated to shareholders by the mail and/or wire mediums. At the same time, the Officers and Board knew, or were deliberately reckless in not knowing, that the annual reports and proxy statements were materially false and misleading due to the material facts being concealed.

71. Said misrepresentations and/or omissions also constitute fraud in the sale of securities as they served to overvalue Chesapeake and artificially inflate its stock price. Once news of the scheme became public, the shares dropped in value significantly.

72. Kathleen is named as a co-defendant in the action herein due to her indirectly benefiting from the actions of her deceased husband. McClendon controlled the company during his tenure as CEO and Chairman of the Board for his own interests, and

not those of Chesapeake or Plaintiff and other shareholders. Even after resigning, McClendon still received a lucrative severance consisting of yearly bonuses, salary, and benefits even while he attempted to undermine Chesapeake by stealing its trade secrets and opening a new company with the secrets in direct competition with Chesapeake.

73. Similarly, AEP is named as a co-defendant in the action herein due to its indirectly benefiting from the actions of its founder McClendon, who formed the company in April 2013 after being forced to resign from Chesapeake. McClendon started the company using his lucrative salary and severance derived from his mismanagement and breach of duties as a member of the Board and Officers of Chesapeake. AEP and its operations also benefitted from McClendon retaining possession of Chesapeake trade secrets, which AEP utilized to compete directly with Chesapeake's operations.

74. Moreover, Ward and SandRidge benefitted indirectly from Chesapeake as they allegedly co-conspired with McClendon and Chesapeake in fraudulent schemes and/or security fraud. The fraudulent schemes have severely damaged Chesapeake and caused it to be drowned with expensive litigation.

## B.     Count Two: Breach of fiduciary duties (Officer/Directors)

75. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

76. The Officers and Board each owed fiduciary duties to Chesapeake and its shareholders, including Plaintiff.

77. By reason of their fiduciary relationships, the Officers and Board specifically owed Chesapeake the highest obligation of loyalty and due care in the administration of the affairs of Chesapeake.

78. Moreover, the directors on the Board had specific fiduciary duties as defined by Chesapeake's key corporate governance documents and principles that would have prevented the misconduct and consequent harm.

79. The Officers and Board also had a fiduciary duty to review, approve, and supervise the issuance of Chesapeake's press releases and public filing to ensure that they were truthful and accurate and conformed to applicable laws. The Officers and Board breached said duties by failing to property supervise and monitor the adequacy of Chesapeake's internal controls and allowing the company to issue and disseminate misleading statements and filings to the SEC and the public.

80. Additionally, the Officers and Board consciously breached their corporate duties and responsibilities as stated herein by creating a highly leverage company, paying management grossly excessive salaries and compensation packages, grossly mismanaging the company to create volatile conditions for stock causing them to drop from $74.00 to as low as $1.50, allowing directors and management to receive personal financial benefits at shareholders' expense, violating the civil and criminal SEC statutes by failing to disclose material facts and allowing corporate assets to be used for personal gain, and selling corporate assets at less than the fair market value.

81. As a direct and proximate result of the Officers' and Board's conscious failure to perform their fiduciary obligations, Chesapeake has sustained significant damages to its corporate assets, goodwill, and market share which in turn injured Plaintiff

and other shareholders. As a result of the misconduct alleged herein, the Officers and Board are liable to Plaintiff.

### i.   Defendants concealed wrongdoing from Chesapeake Shareholders

82. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

83. The Officers and Board concealed the facts pertaining to McClendon's personal loans and conflicted hedge fund which McClendon ran from Chesapeake's headquarters.

84. Meanwhile, Chesapeake mislead investors and shareholders regarding the same as the annual reports and proxy statements never mentioned any of the loans.

85. The Officers and Board drafted, approved, reviewed and signed the annual reports and proxy statements before they were filed with the SEC and disseminated to shareholders.

86. Moreover, the Officers and Board knew, should have known, or were deliberately reckless in not knowing that the annual reports and proxy statements were materially false and misleading.

### ii.   Demand on the Chesapeake board of directors would be futile

87. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

88. Plaintiff did not issue a demand upon the Board as the directors would be interested and unable to consider Plaintiff's claims, and/or engaged in conduct in conduct

that is not a legitimate exercise of judgment. McClendon continued to have a stronghold on the Officers and Board, even after "resigning" as evidenced by the lucrative severance package he had received. Additionally, portions of the Officers and Board still maintain their roles or benefits with Chesapeake, creating a conflict of interest.

89. Moreover, the Board knew of or, in its exercise of due diligence, would have known of the actual and potential conflicts of interest and material facts regarding McClendon's loans and stealing of trade secrets and Chesapeake's undisclosed debt, and failed to disclose the same. Due to the potential for liability for concealing said facts, the Board is interested and cannot independently evaluate a demand.

90. Likewise, the omission of material information cannot be a reasonable exercise of business judgment, and such acts cause the Board to be incapable of properly acting to any such demand.

## C.    Count Three: Gross Mismanagement

91. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

92. The Officers and Board had a duty to Chesapeake and its shareholder to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the company. However, the Officers and Board engaged in the wrongdoing alleged herein by their actions, and abandoned and abdicated their responsibilities and duties with regard to prudently managing Chesapeake in a manner consistent with the duties imposed upon them by law. By committing the misconduct

alleged herein, the Officers and Board breached their duties of due care, diligence, and candor in the management and administration of Chesapeake's affairs and in the use and preservation of its assets.

93. During the course of the discharge of their duties, the Officers and Board were aware of the unreasonable ricks and losses associated with their misconduct; however, the Officers and Board caused Chesapeake to engage in the scheme described herein which they knew had an unreasonable risk of damage to the company, thus breaching their duties. As a result, the Officers and Board grossly mismanaged Chesapeake, thereby causing damage to the company and its shareholders.


**D.      Count Four: Abuse of Control**

94. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

95. The Officers and Board's conduct, as alleged herein, constituted an abuse of their control over Chesapeake to the detriment of the company and its shareholders.

96. As a direct and proximate result of the Officers and Board's abuse of control, Chesapeake has suffered, and will continue to suffer, damages for which the Officers and Board are liable. Said damage resulted and continues to result in Chesapeake losing value, and said losses are transferred to its shareholders.

**E.      Count Five: Waste of Corporate Assets**

97. Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

98. The Officers and Board's conduct, as alleged herein, constituted a waste of the corporate assets of Chesapeake to the detriment of the company and its shareholders, including Plaintiff.

99. As a direct and proximate result of the Officers and Board's abuse of control, Chesapeake has suffered, and will continue to suffer, damages for which Defendants are liable. Said damage resulted and continues to result in Chesapeake losing value, and said losses were transferred to its shareholders.


**F.      Count Six: Violations of Section 10(B) of the Exchange Act and Rule 10B-5**

100.      Plaintiff realleges and incorporates by reference all prior allegations contained in the previous and subsequent paragraphs as if the same were fully set forth herein.

101.      The Officers and Board disseminated, and/or approved the false statements specified herein, which they knew or recklessly disregarded were false or misleading and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made.

102.      The Officers and Board violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by the following: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other similarly situated n connection with their purchases of Chesapeake common stock. As detailed herein, the misrepresentations contained in, or the material facts omitted from, Chesapeake's public filing and reports, including SEC filings, concerned, among other things, the facts underlying the claims in this Complaint.

103.     The Officers and Board also directly and/or indirectly, by the use of means or instrumentalities of interstate commerce and/or postal mail system, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the shareholders including Plaintiff. The Officers and Board made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made. The Officers and Board made the above referenced statements with a grossly reckless disregard for the truth, and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to: (i) deceive the investing public, including Plaintiff and other shareholders, regarding the facts underlying the claims in this Complaint; (ii) artificially inflate and maintain the market price of Chesapeake securities; and (iii) cause Plaintiff and other shareholders to purchase Chesapeake securities at artificially inflated prices.

104.     The allegations set forth above establish a strong inference that The Officers and Board acted with scienter as they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that the failed to ascertain and disclose such facts. The Officers and Board's material misrepresentations and/or omissions were done knowingly or with extreme recklessness for the purpose of deceiving the investing public and supporting the artificially inflated price of Chesapeake's stock.

105.    As a result of the Officers and Board's dissemination of material false and misleading information and failure to disclosure material facts, Plaintiff and other shareholders have suffered damages from their good faith their reliance upon the integrity of the market which influenced them to purchase the inflated prices for Chesapeake stock. Plaintiff and other shareholders would not have purchased Chesapeake stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Officers and Board's misleading statements and mismanagement. At the time of the dissemination of the materially false, misleading information, and failure to disclose material facts, Plaintiff and other shareholders were ignorant of the falsity of the statements and were ignorant of the material omissions, and justly so as they could not be expected to know the truth.

106.    The Officers and Board's wrongful conduct was the direct and proximate result of Plaintiff's and other shareholders' injuries in connection with their purchase of Chesapeake stock. As a result, the Officers and Board are liable for all materially false and misleading statements made as alleged above.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

1.   Determining that this action is a proper derivative and/or class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative and Plaintiff as class counsel;

2.   That demand upon the Board is excused as it would have been futile;

3.   Awarding compensatory damages in favor of Plaintiff and other class members against all Defendants, jointly and severally, for the damages sustained as a result of Defendants' wrongdoings, and including treble damages for RICO violations;

4.   Enjoining Defendants from further violating their fiduciary duties;

5.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses; and

6.   Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demand a trial by jury.


DATED:        April 12, 2016
             Tonawanda, New York



             Kevin T. Stocker, Esq.
             NYWD Bar number: WD0001924

**VERIFICATION**

STATE OF NEW YORK )
COUNTY OF ERIE        ) ss:

   KEVIN T. STOCKER, being duly sworn, depose and say: that deponent is the Claimant in the within action; that deponent has read the foregoing **COMPLAINT** and knows the contents thereof; that the same are true to deponent's own knowledge, except as to the those matters therein stated to be alleged on information and belief, and that as to those matters deponent believes them to be true.

                 Kevin T. Stocker

Sworn to before me this 12th
day of April, 2016.

  Notary Public

Kevin B. Campbell
My Commission Expires 6/9/2018
Qualified in Erie County, NY